IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CONSOLIDATED RAIL CORPORATION, | : | Civil Action No.:    07-1370 (RMU) |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| GERARD A. RITTER and SUSAN R. NOREK *ex rel.* GERARD H. RITTER, deceased. | : | |
| | : | |
| Defendants. | : | |
| CONSOLIDATED RAIL CORPORATION, | : | Civil Action No.:    07-1371 (RMU) |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| JOHN M. GRIBBIN, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## <u>MOTION FOR RECONSIDERATION</u>

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Consolidated Rail Corporation ("Conrail"), through its undersigned counsel, respectfully moves for reconsideration of the Court's Memorandum Opinion dated March 27, 2008 granting the Defendants' Motions to Dismiss Conrail's Complaints for Declaratory Relief.  The grounds for Conrail's motion are set forth more fully in the accompanying Memorandum of Points and Authorities in Support of the Motion for Reconsideration.

Respectfully submitted,


_____/s/_____
Charles H. Carpenter
(D.C. Bar No. 432004)
PEPPER HAMILTON LLP
Hamilton Square
600 Fourteenth Street, N.W.
Washington, DC  20005-2004
Tel:  (202) 220-1200
Fax:  (202) 220-1665



Laurence Z. Shiekman  (*pro hac vice*)
Joanna J. Cline
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
Tel: (215) 981-4000
Fax: (215) 981-4750

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| CONSOLIDATED RAIL CORPORATION, | : | Civil Action No.: | 07-1370 (RMU) |
| | : | | |
| Plaintiffs, | : | | |
| | : | | |
| v. | : | | |
| | : | | |
| GERARD A. RITTER and SUSAN R. NOREK *ex rel.* GERARD H. RITTER, deceased. | : | | |
| | : | | |
| Defendants. | : | | |
| CONSOLIDATED RAIL CORPORATION, | : | Civil Action No.: | 07-1371 (RMU) |
| | : | | |
| Plaintiff, | : | | |
| v. | : | | |
| | : | | |
| JOHN M. GRIBBIN, | : | | |
| | : | | |
| Defendant. | : | | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
CONSOLIDATED RAIL CORPORATION'S MOTION FOR RECONSIDERATION**

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Consolidated Rail

Corporation ("Conrail"), through its undersigned counsel, respectfully moves for reconsideration

of the Court's Memorandum Opinion dated March 27, 2008 granting the Defendants' Motions to

Dismiss Conrail's Complaints for Declaratory Relief.

**I.    INTRODUCTION**

Conrail commenced these actions seeking a declaratory judgment regarding its

alleged liability as a successor in interest for the claimed tortious conduct of certain railroads

occurring prior to the April 1, 1976 conveyance of specifically designated rail assets to Conrail.

Defendants moved to dismiss Conrail's complaints for lack of subject matter jurisdiction. In particular, Defendants took issue with Conrail's position that, pursuant to § 209 of the Rail Act, 45 U.S.C. § 719(e), this Court has exclusive and original jurisdiction to decide claims of Conrail's liability resting solely on pre-conveyance acts of those companies that conveyed assets to Conrail. Defendants made their motions pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure; Defendants did not move under Rule 12(b)(6), and the parties did not brief the merits of the successor liability issue.

The Court granted Defendants' motions to dismiss. In its Memorandum Opinion, the Court set forth the legal standard applicable to defendants' motions—that for dismissal under Rule 12(b)(1)—and concluded that it lacked subject matter jurisdiction to rule on the question of Conrail's successor liability for asbestos claims. In the course of reaching that conclusion, however, the Court made a clear error of law. Rather than conducting a Rule 12(b)(1) jurisdictional analysis pursuant to the standard it set forth, the Court engaged in a Rule 12(b)(6)-type analysis of the merits of Conrail's claim. The Court effectively (and incorrectly) ruled that the Special Court's conveyance order and the Rail Act do not preclude successor liability, despite its simultaneous (also incorrect) conclusion that it had no jurisdiction to reach that question.

Conrail respectfully requests that the Court reconsider its decision and find that its jurisdiction under § 209(e) to interpret the orders conveying the designated assets of transferor railroads to Conrail includes jurisdiction to determine whether, as a result of those conveyances, Conrail assumed successor liability for alleged torts. Only after the Court makes the threshold determination that it has subject matter jurisdiction can it properly rule on whether this Court's conveyance order and the Rail Act impose successor liability on Conrail. Once the merits are

squarely before the Court and the parties fully have briefed the liability question (which is different than the jurisdictional question), Conrail requests that the Court reconsider its conclusion that the asset-based conveyance under the Rail Act, as implemented by this Court's conveyance order, may result in successor liability on Conrail for asbestos claims.

Indeed, significant prior case law exists, which this Court likely did not have the opportunity to review given the procedural posture of the matter, that very strongly contradicts this Court's conclusion that the Rail Act's proscription of Conrail's successor liability was limited to land use.

## II.    HISTORY OF THE RAIL ACT AND THE SPECIAL COURT

Between 1967 and 1973, the major northeastern railroads filed for bankruptcy. *See, e.g.*, *Schweitzer v. Consolidated Rail Corp.*, 65 B.R. 794, 800 (E.D. Pa. 1986). "In response to the threat these filings and their underlying causes posed to continued rail service in the Northeast, Congress passed the Regional Rail Reorganization Act of 1973 ('Rail Act')." *Id.* Congress intended the Rail Act to provide for "the reorganization of railroads in this region into an economically viable system capable of providing adequate and efficient rail service to the region," which service Congress deemed necessary "to meet the needs of commerce, the national defense, the environment, and the service requirements of passengers, United States mail, shippers, States and their political subdivisions, and consumers." Rail Act §§ 101(b)(2) & 101(a)(3).

As this Court put it, "Congress viewed the successor railroads as the phoenix rising from Penn Central's ashes. The Rail Act and related conveyances are the mechanisms that Congress chose to effectuate its goals. Chief among Congress's priorities was to give the railroads a fresh start; that is, to 'wipe the slate clean.'" *Penn Central Corp. v. United States*,

862 F. Supp. 437, 461 (Sp.Ct.R.R.R.A. 1994) (citing 119 Cong.Rec. 43,095 (1973) (Remarks of Sen. Long)).

Not surprisingly, the changes brought about by the Rail Act spawned decades of litigation regarding what Congress's declared "fresh start" meant from a practical perspective. The transferor railroads, Conrail, and claimants of all types engaged in substantial litigation over interpretation of the conveyance orders effectuating the asset transfers as well as the application of various provisions of the Rail Act and related statutes. The extent of the litigation was such that this Court, which had been formed in 1973, divided itself into two separate panels after the passage of the Northeast Rail Services Act ("NRSA") in 1981 in order to handle the case load. *See* Rule 4, Rules of the Special Court, R.R.R.A. of 1973 (May 20, 1982) (attached as Ex. A). Each panel had exclusive jurisdiction to hear different types of cases. One panel sat pursuant to § 1152 (a) of NRSA and heard only cases involving the interpretation of NRSA ("the § 1152 Panel"). The other panel—"the General Panel"—exercised jurisdiction under § 209(e) of the Rail Act, hearing, among others, cases involving the interpretation of asset conveyance orders "in order to effect the purposes of [the Rail Act] or the goals of the final system plan." § 209(e)(2).[1]

The instant matter is before the Court pursuant to § 209(e). Though the division of the Court into two panels has been abolished and this Court as a single forum now hears claims pursuant to both § 1152 and § 209, the history of the Court and the distinctions between

---

[1] The United States Railway Association ("USRA") published the two-volume Final System Plan ("FSP") on July 26, 1975, *inter alia*, identifying which of the assets owned by the railroads in reorganization in the Northeast and Midwest United States should be designated for conveyance to Conrail. *See generally* 45 U.S.C. §§701-708. Chapter 8-Designations constituted the operative portion of the FSP and identified with some particularity the properties Conrail would begin operating effective April 1, 1976. While the FSP did not specifically deal with asbestos claims, USRA did note generally that, consistent with the "fresh start" policy, the accounts receivable and payable that are allocable to operations before conveyance shall remain those of the railroads conveying assets to Conrail. I FSP 253.

its different types of jurisdiction are critical to understanding the substantial case law regarding Conrail's potential successor liability.

## III.    ARGUMENT

A court should grant a Rule 59(e) motion to alter or amend a judgment where "there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear legal error or prevent manifest injustice." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  In addition, such a motion "will be granted if the moving party presents factual matters or controlling decisions the court overlooked that might have materially influenced its decision." *Taylor v. Cuomo*, 2008 WL 63283 at *1 (E.D.N.Y. Jan. 3, 2008); *see also Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir. 1995) (motion for reconsideration proper where moving party can point to "controlling decisions or data that the court overlooked - matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."). Though reconsideration and amendment of a previous order is an "unusual measure," a court has "considerable discretion" under Rule 59(e). *Capital Yacht Club v. Vessel AVIVA*, 2006 WL 2792679 (D.D.C. 2006).[2]

In this case, the Court made clear legal errors that demand a second look.  The Court's Opinion as currently framed has the potential to impact, inappropriately and perhaps inadvertently, the disposition of the successor liability question in dozens of asbestos cases pending across the country notwithstanding that the Court has said it lacks jurisdiction to decide that question and notwithstanding that the parties have not had the opportunity to brief the merits

---

[2] In ruling on a motion to reconsider, "the court should keep an open mind, and should not hesitate to grant the motion if necessary to prevent manifest injustice or clear error." *See Karr v. Castle*, 768 F. Supp. 1087, 1093 (D. Del. 1991).

of that issue to address prior decisions that likely would have influenced the Court's decision here.  Rule 59(e) is aimed at affording relief in precisely such a situation.[3]

> **A.**    **This Court Has Subject Matter Jurisdiction.**

The question before the Court on Defendants' motions to dismiss was whether or not this Court has jurisdiction under § 209(e) to determine Conrail's liability as an alleged successor in interest for the pre-conveyance tortious conduct of railroads whose assets were conveyed to Conrail.  If the determination of that liability question depends upon an interpretation of a so-called "conveyance order," then the Court has § 209(e) jurisdiction.

Rather than directly addressing that question and without the opportunity for the parties to engage in any discovery or to submit substantive briefs, the Court analyzed the merits-related issue of whether tort liability is a "lien or encumbrance" for purposes of § 303(b)(2) of the Rail Act's[4] mandate that all rail properties would be conveyed to Conrail "free and clear of any liens or encumbrances."  Mem. Op. at 5 (suggesting that § 303(b) provides the "operative language" for the jurisdictional question).  Conrail respectfully submits that Court's analysis of section 303(b)(2) misses the crux of the jurisdictional analysis.  The "operative language" in determining whether the Court has subject matter jurisdiction here is not found in § 303(b) ("Conveyance of Rail Properties") as the Court suggests, but in § 209(e) itself ("Original and Exclusive Jurisdiction").  Section 209(e) defines the Court's jurisdiction; § 303(b) is but part of a statutory scheme that should guide the Court in its exercise of that jurisdiction.

---

[3] At the very least, Conrail respectfully requests that the Court clarify that its Memorandum Opinion did not effect a blanket holding that the Rail Act actually imposes successor liability on Conrail for asbestos claims. That is, even if the Court were to assume subject matter jurisdiction and hold to its view that the Rail Act does not preclude successor liability against Conrail for tort claims, such a holding does not obviate the need to analyze the successor liability question on a case by case basis according to the applicable law in the state where each case remains pending.

[4] Section 303(b) of the Rail Act is codified at 45 U.S.C. 743(b).

Section 209(e) provides this Court with the exclusive jurisdiction to interpret the conveyance orders that effected the conveyance of the assets of the transferor railroads to Conrail. The conveyance order at issue here provides that "[t]he conveyance of all properties . . . shall be subject to all applicable terms and conditions of the Conveyance Documents, the Rail Act and this Order." Conveyance Order § 2 (attached as Exhibit A to the Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss the Complaint of Consolidated Rail Corporation (Ritter Docket # 12)). Interpreting the conveyance order, then, necessarily entails an analysis of those portions of the Rail Act and its underlying statutory scheme that govern the conditions of the asset conveyance, among them § 303(b).

It is that very analysis in which Conrail asked the Court to engage by filing the instant complaints. The parties dispute the scope and nature of the conveyances made to Conrail, specifically, whether the conveyance order, and the Rail Act as incorporated therein, proscribe the imposition of successor liability on Conrail (without need to resort to a state by state argument that successor liability does not attach in the aftermath of an asset conveyance). This Court is the only body empowered to answer that question definitively in the first instance as a matter of federal law interpreting its conveyance orders, and Conrail requests that the Court revisit its decision that it has no jurisdiction to do so. [5]

---

[5] To the extent the Court relied upon *Reading* to analyze its jurisdiction here, such an analysis was inappropriate for the reasons explained above, *i.e.*, that the *Reading* panel, sitting with jurisdiction under § 1152, only had jurisdiction to hear claims regarding NRSA. That panel's conclusion that it had no jurisdiction to rule on successor liability has nothing to do with the jurisdictional analysis in this case. This case, in contrast to *Reading*, was brought under § 209(e) and relates to the interpretation of the conveyance orders. When this Court sits pursuant to § 209(e), "[i]t is beyond peradventure that, to the extent liability is premised upon successor liability, it is governed by this court's conveyance order, or the conveyance documents, and is within our jurisdiction." *Consolidated Rail Corp. v. Commonwealth of Pa. Dep't of Gen. Svcs.*, Civ. No. 97-RR-01, 5-6 (Sp. Ct. R.R.R.A. 1997) (attached as Exhibit B to the Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss the Complaint of Consolidated Rail Corporation (Ritter Docket # 12)).

B.    **The Rail Act Precludes Successor Liability.**

As noted, notwithstanding the Court's holding that it lacked jurisdiction to hear

Conrail's claim, the Court effectively issued a decision on the merits against Conrail, concluding

that the Rail Act does not preclude the imposition of successor asbestos liability on Conrail.  *See*

Mem. Op. at 2, 6.  The Court reached its conclusion principally through an analysis of a single

provision of the Rail Act—§ 303(b)—which none of the parties had the opportunity to brief, and

which Conrail cited only in passing as an example of a provision reflective of the Rail Act's

broader goal that Conrail be afforded a legal and financial "fresh start" toward the end of

creating a financially viable railroad operation.

Without the benefit of briefing on the issue, the Court likely was unaware of

several cases that are inconsistent with the Court's conclusion that § 303(b) should be read as

limiting Conrail's absolution from successor liability to claims related to land use only.  For

example, in *Schweitzer v. Consolidated Rail Corp.*, 65 B.R. 794 (E.D. Pa. 1986), the court was

faced with asbestos claims brought against Conrail and the Reading Company, which had

emerged from reorganization as a viable entity though all of its rail holdings had been conveyed

to Conrail in 1976.  As an alternative argument in support of its motion to dismiss plaintiffs'

claims, Reading argued that any liability for plaintiffs' asbestos claims was conveyed to Conrail

along with its rail properties.  The court rejected Reading's argument, noting, as Conrail argues

here, that the purpose of the Rail Act "was to revive the severely distressed northeastern rail

system to assure adequate rail service in that region," and reasoning that "Congress intended to

burden Conrail with only limited obligations" specified in the Rail Act.  *Id*. at 801.  The court

went on to say:

> Faced with the structure of the Rail Act, the Act's avowed purpose
> of fostering northeastern rail service, and the absence of legislative
> history suggesting a fundamental change in reorganization law, I

> must conclude that Congress did not intend to impose on Conrail
> the primary responsibility for non-discharged F.E.L.A. claims
> which arose from the debtor's pre-conveyance conduct."

*Id.* at 802.

Similarly, *Zulkowski v. Consolidated Rail Corp.*, 852 F.2d 73 (3d Cir. 1988),

involved asbestos claims for alleged pre-conveyance negligence brought by a former employee

of the Central Railroad of New Jersey ("CNJ") against Conrail (which was conveyed CNJ's

designated rail assets) and CJI Industries (the entity CNJ became upon emerging from

reorganization). Like Reading in *Schweitzer*, CJI argued that it could not be held liable for

plaintiffs' claims because any liability for plaintiffs' claims was passed to Conrail as a result of

this Court's conveyance orders. The Third Circuit did not reach the issue of Conrail's liability,

instead limiting its holding to CJI's liability (and concluding that there was no basis for relieving

CJI from liability for plaintiffs' claims). In the course of analyzing CJI's liability, however, the

court made the following observation:

> [N]owhere in [CJI's citations to the Rail Act and its legislative
> history], or elsewhere in the Rail Act, is there any provision
> transferring the liability for a claim of the type made here from an
> entity reorganized under the Act to Conrail.

*Zulkowski*, 852 F.2d at 77.

The reasoning of *Schweitzer* and *Zulkowski* applies with equal force to the instant

case. The provisions of the Rail Act and related legislative history that were incorporated into

the conveyance orders simply do not support the contention that Congress intended for Conrail to

assume liability for asbestos claims directed at transferor railroads and based on actions

occurring before the April 1, 1976 conveyance date. Quite to the contrary, Congress intended

that Conrail only would be burdened with the obligations specifically articulated in the Rail Act.

*Schweitzer*, 65 B.R. at 801. Indeed, that Conrail's liability is limited to obligations specified in

the Rail Act has been confirmed by courts in contexts outside of asbestos cases and land use

cases. *See Howard v. Penn Central Transportation Co.*, 87 F.R.D. 342, 348 n.8 (N.D. Ohio

1980) (refusing to impose on Conrail monetary liability for Title VII and section 1981 claims

against a transferor railroad and noting "[c]ase law indicates that Congress intended the financial

obligations of transferor railroads to remain the responsibility of the estates of those railroads and

not be passed on to Conrail unless a specific statutory exception was made."); *United States*

*Fidelity & Guaranty Co. v. Di Massa*, 496 F. Supp. 71, 75-76 (E.D. Pa. 1980) (declining to hold

Conrail liable as successor for antitrust violations and noting that "[p]ursuant to the [Rail Act],

ConRail was formed in April 1976, to take over the operating assets of certain bankrupt

railroads, one of which was the Reading Company.  In doing so, ConRail did not become a

successor corporation which assumed all of Reading's pre-1976 liabilities.").  No such statutory

exception exists here.

        *Pa. Dep't of Gen. Svcs.*, cited by Conrail in its complaint and in its opposition

brief, is yet another case corroborative of Conrail's position.  Although the Court in its

Memorandum Opinion in this case acknowledged *Pa. Dep't of General Services*, it distinguished

the decision, relying upon the "liens or encumbrances" language of § 303(b)(2).  Such a

conclusion is not in line with the articulated reasoning of the Court, which focused not on § 303

but on the broader policy behind the Rail Act.  As the Court explained in refusing to hold Conrail

liable for the alleged actions of a transferor railroad:

                The fresh start policy embodied in the Rail Act . . . creates a bright
                line date upon which the liability of [the transferor railroad] ended
                and the liability of Conrail began.  Congress mandated that there
                be no successor liability hindering the future financial well being
                of the newly created Conrail.  Any recovery in contract, tort or
                otherwise for the conduct of [the transferor railroad] was
                legislatively and contractually apportioned to be satisfied out of the
                assets of the bankrupt railroad."

Slip. Op. at 6-7; *City of Philadelphia v. Consolidated Rail Corp.*, C.A. No. 96-RR-01 (Sp. Ct. R.R.A. 1997) (Weiner, J) (same) (attached as Ex. B).

    Judge Weiner, who wrote both the *Pa Dep't of General Services* decision and the *City of Philadelphia* decision, was also on the § 1152 Panel that decided the *Reading* case on which the Court relies in the instant matter to support its conclusion that the Rail Act does not preclude successor liability against Conrail.  *See* Mem. Op. at 8.  Conrail respectfully submits that the Court's reading of *Reading* was incorrect.  Presumably in concluding in *Pa. Dep't of General Services* and *City of Philadelphia* that Conrail was not hindered by successor liability for tort claims against transferor railroads, Judge Weiner was well aware of the *Reading* opinion. Judge Weiner had no need to address *Reading* in those cases because it was inapposite, just as it is here.

    Contrary to the Court's apparent conclusion in its Memorandum Opinion here, *Reading* did not address the issue of whether the Rail Act precluded successor asbestos liability as a general matter.  In fact, the *Reading* panel itself, which was sitting pursuant to § 1152 only, very clearly said that it was not addressing that issue because it had no jurisdiction to do so.  *See Reading* at 14 ("We must limit our decision to those questions which fit squarely within our § 1152(a)(1) jurisdiction, that is, the preemptive effect of § 709(b) or other provisions of NRSA."); *id.* at 25 (noting that the Court did not question "that the Rail Act and subsequent legislation did create a comprehensive federal scheme designed to revitalize freight railroads in the region" but concluding that the issue of whether that scheme precluded the imposition of successor liability on Conrail was not for "this court," *i.e.* the § 1152 Panel of the Special Court, to determine).  As such, the *Reading* case should not govern the Court's analysis of the claims currently before it.

## IV.     CONCLUSION

For the forgoing reasons, Conrail respectfully urges this Court to grant its motion for reconsideration and to set the matter for any necessary discovery, briefing, and argument on the merits of Conrail's claim that, under this Court's conveyance orders and the Rail Act, Conrail is not liable for pre-conveyance claims for asbestos liability to the extent that the alleged liability causing acts occurred prior to the April 1, 1976 conveyance date.

Respectfully submitted,

_____/s/_____
Charles H. Carpenter
(D.C. Bar No. 432004)
PEPPER HAMILTON LLP
Hamilton Square
600 Fourteenth Street, N.W.
Washington, DC  20005-2004
Tel:  (202) 220-1200
Fax:  (202) 220-1665

Laurence Z. Shiekman  (*pro hac vice*)
Joanna J. Cline
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
Tel: (215) 981-4000
Fax: (215) 981-4750

# RULES OF THE SPECIAL COURT, REGIONAL RAIL REORGANIZATION ACT OF 1973

### May 20, 1982

### PREAMBLE

Section 1152(d) of the Northeast Rail Service Act of 1981 (NRSA), 95 Stat. 676-77, provides:

> **(d)** If the volume of civil actions under subsection (a) of this section so requires, the United States Railway Association shall apply to the judicial panel on multi-district litigation authorized by section 1407 of Title 28, United States Code, for the assignment of additional judges to the special court. Within 30 days after the date of such application, the panel shall assign to the special court such additional judges as may be necessary to exercise the jurisdiction described in subsection (a) of this section.

On March 16, 1982, at the request of the then members of this Court (Presiding Judge Friendly and Judges Wisdom and Thomsen) the United States Railway Association applied to the Judicial Panel on Multidistrict Litigation to assign to this Court three additional judges to exercise the jurisdiction described in § 1152(a) of NRSA. On May 12, 1982, said panel designated Hon. Oliver Gasch, Hon. William B. Bryant, and Hon. Charles R. Weiner as three additional judges to exercise such jurisdiction.

This Court's understanding of § 1152(d) is that the three additional judges (hereafter the § 1152 Panel) are empowered only to exercise the jurisdiction described in § 1152(a), and that the judges previously designated (and their successors) are empowered (1) to exercise exclusively all other jurisdiction of this Court, and (2) to participate, to such extent as the § 1152 Panel may desire and as they may be willing, in the exercise of the jurisdiction described in § 1152(a). It has thus become necessary to revise the Rules of this Court to read as follows:

Rule
1. Name.
2. Seal.
3. Situs, Clerk, Executive Attorney, and Communications.
4. Panels of the Court.
5. Action by Single Judge--Quorum.
6. Sessions.
7. Attorneys.
8. Form of Briefs and Other Papers.
9. General Provision with Respect to Filing of Pleadings and Other Papers.
10. Proceedings under § 209(e) of the Act, § 1152(a) of NRSA and of Similar Nature--Filings and Service.
11. Proceedings under § 303(c) and under § 306(c)(4) of the Act--Filings and Service.
12. Applicability of Federal Rules of Civil Procedure.
13. Proceedings Involving Interstate Commerce Commission.
14. Proceedings under Section 305(d) of the Act.
15. Motions.
16. Entry of Orders by the Executive Attorney.
17. Opinions and Rulings of the Court.
18. Petitions for Reconsideration.
19. References to **Regional Rail Reorganization Act** and Northeast Rail Services Act.

### Rule 1. Name

The name of the Court is "Special Court, **Regional Rail Reorganization Act** of 1973".

### Rule 2. Seal

The seal of the Court shall be that of the United States District Court for the District of Columbia.

### Rule 3. Situs, Clerk, Executive Attorney, and Communications

**A. Situs.**  The situs of the Special Court shall be at the United States Courthouse, Washington, D.C. 20001.

**B. Clerk of Court.**  The Clerk of the District Court for the District of Columbia shall be the Clerk of the Special Court. The Clerk shall supply such number of deputy clerks and other personnel as the business of the Special Court may require. All rules of said District Court with respect to the Clerk shall apply to his functions as Clerk of the Special Court.

**C. Executive attorney.**  The Court may appoint an executive attorney who shall be subject to removal by the Court. The executive attorney's official station shall be at the United States Courthouse, Washington, D.C. 20001.

**D. Communications.**  All communications to the Special Court, save those hereafter directed to be sent directly to the judges, shall be made to the executive attorney who shall transmit them in accordance with directions of the Court or a judge thereof.

**E. Place of conducting proceedings.**  At the discretion of the judges of the Special Court, hearings, oral arguments and any other proceedings may be held in any federal courthouse or other federal building within the region as defined in § 102(15) of the **Regional Rail Reorganization Act** of 1973 or at the official station of any judge of the Court.

> **References in Text.** Section 102(15) of the **Regional Rail Reorganization Act** of 1973, referred to in par. E, defining "Region", was redesignated section 102(17) by Pub.L. 97-35, Title XI, § 1135(b), Aug. 13, 1981, 95 Stat. 646, and is classified to section 702(17) of this title.

### Rule 4. Panels of the Court

**A. Two panels.**  The Court shall consist of two panels of three judges to be known as the General Panel and the § 1152 Panel. The General Panel consists of the judges appointed from time to time by the Judicial Panel on Multidistrict Litigation under § 209(b) of the **Regional Rail Reorganization Act** of 1973 (the Act). The § 1152 Panel consists of the judges appointed from time to time by the Judicial Panel on Multidistrict Litigation under § 1152(d) of the Northeast Rail Service Act of 1981 (NRSA).

**B. Presiding Judges.**  Each panel shall appoint one of its members as its Presiding Judge. The Presiding Judge of the General Panel shall be the Presiding Judge of the Court.

**C. The General Panel.** The General Panel shall have exclusive jurisdiction over all actions described in § 209(e), over proceedings under §§ 303 and 306(c)(4), and over supplemental transactions proposed under § 305 of the Act.

**D. The § 1152 Panel.** The § 1152 Panel shall have primary responsibility for all actions arising under § 1152(a) of NRSA. If the Presiding Judge of the § 1152 Panel so requests, one or more of the judges of the General Panel may (but shall not be required to) sit in a particular action under § 1152(a) of NRSA in the place and stead of the same number of judges of the § 1152 Panel. Any such request shall be made to the Presiding Judge of the General Panel or, in the event of his unavailability, to one of the other judges of the General Panel in order of precedence.

> **References in Text.** Section 209(b) and (e) of the **Regional Rail Reorganization Act** of 1973, referred to in pars. A and C. is section 209(b) and (e) of Pub. L. 93-236, Title II, Jan. 2, 1974, 87 Stat. 999, which enacted subsecs. (b) and (e) of this section.
>
> Section 1152 of the Northeast Rail Service Act of 1981, referred to in pars. A and D, is section 1152 of Pub. L. 97-35, Title XI, Aug. 13, 1981, 95 Stat. 676, which enacted section 1105 of this title.
>
> Sections 303, 306(c)(4), and 305 of the Act, referred to in par. C, are section 303 of Pub. L. 93-236, Title III, Jan. 2, 1974, 87 Stat. 1005, which enacted section 743 of this title, and sections 306(c)(4) and 305 of Pub.L. 93- 236, Title III, as added Pub. L. 94-210, Title VI, § 610(b), Feb. 5, 1976, 90 Stat. 100, 104, which enacted sections 746(c)(4) and 745 of this title, respectively.

## Rule 5. Action by Single Judge--Quorum

**A. Action by single judge.** Any one of the judges of the General Panel shall have the power with respect to actions described in Rule 4C, and any one of the judges of the § 1152 Panel (or any judge of the General Panel designated pursuant to Rule 4D) shall have the power with respect to actions arising under § 1152 of NRSA, specified in the case of three-judge courts by 28 U.S.C. § 2284(b)(3) and the powers exercised by a single judge in accordance with established procedures in the courts of appeals. A panel may also authorize a single judge to preside over the taking of testimony.

**B. Quorum.** Subject to paragraph A of this rule, two judges of the General Panel shall constitute a quorum with respect to actions described in Rule 4C, and two judges who are members of the § 1152 Panel or who have been designated pursuant to Rule 4D shall constitute a quorum with respect to actions arising under § 1152(a) of NRSA.

**C. Inability of one judge to participate in decision.** If a matter has been heard by a panel of three judges and one of such judges shall be unable to continue with the consideration of the matter by reason of death, illness, resignation, or incapacity, or shall be relieved of such consideration at his request, the two remaining judges will determine the matter if they are in agreement and neither requests the designation of a third judge.

> **References in Text.** Section 1152 of NRSA, referred to in pars. A and B, is section 1152 of Pub. L. 97-35, Title XI, Aug. 13, 1981, 95 Stat. 676, which enacted section 1105 of this title.

## Rule 6. Sessions

The Court shall not hold formal terms, but shall be deemed always open.

## Rule 7. Attorneys

Every member in good standing of the bar of any district court or court of appeals of the United States or of the bar of the Supreme Court of the United States is entitled to practice before the Special Court. Any other attorney desiring so to practice must obtain admission to practice before the United States District Court for the District of Columbia.

## Rule 8. Form of Briefs and Other Papers

Printing of briefs or any other papers filed in this Court is not required. Briefs and other papers may be typewritten on opaque, unglazed paper 8 1/2 by 11 inches in size, with copies reproduced by any method resulting in clearly readable copy. All briefs and other papers shall be double spaced. Briefs shall be bound in soft covers: blue for the United States Railway Association (USRA); green for Consolidated Rail Corporation (Conrail); grey for the Secretary of Transportation (Secretary) and the United States; yellow for Central New Jersey Industries and Lehigh & New England Railroad; purple for railway labor organizations; pink for commuter authorities; and white for other parties.

## Rule 9. General Provision With Respect to Filing of Pleadings and Other Papers

Two copies of each pleading or other paper filed with the Clerk shall be delivered to each of the three judges of the panel of the Court to which the matter has been assigned. Each such paper shall contain in its caption a precis stating the name of the party filing the paper, the nature of the paper filed, and, where applicable, the nature of the relief sought and the names of the persons against whom relief is sought. Four copies of each such paper that is required to be served upon any person shall be delivered to the Clerk.

## Rule 10. Proceedings Under § 209(e) of the Act, § 1152(a) of NRSA and of Similar Nature--Filings and Service

**A. Scope.** This Rule applies to:

(1) Any civil action described in § 209(e) of the Act or § 1152(a) of NRSA;

(2) Any other civil action of which this Court has jurisdiction wherein the plaintiff seeks relief against a particular defendant or defendants, except proceedings under § 303(c) of the Act and proceedings under § 306(c)(4) for the determination of the base value of certificates of value.

**B. Initial process and assignment.** The procedures for commencement of an action under this Rule are:

(1) The process for beginning an action under this rule shall be as described in Rule 4, F.R.Civ.P., except as the Court shall otherwise order;

(2) Subsequent to the filing of any such action, that action shall be assigned to a panel of the Court, in accordance with Special Court Rule 4, by an order of the executive attorney. Two copies of each pleading or other paper filed with the Clerk shall be delivered by the person filing the paper to each of the judges of the panel to which the matter has been assigned.

**C. Subsequent pleadings and other papers.** Service and filing of other papers shall be as described in Rule 5, F.R.Civ.P., except as the Court shall otherwise order.

**D. Actions under § 209(e)(1)(D) of the Act or § 1152(a)(3) of NRSA.** The complaint in any action under § 209(e)(1)(D) or § 1152(a)(3) shall be accompanied by a statement why adequate relief cannot be had under the Federal Rules of Civil Procedure, Part V. The Court may dismiss any such action on motion or sua sponte for failure to file such a statement or if the statement is inadequate.

> **References in Text.** Section 209(e) and (e)(1)(D) of the Act, referred to in pars. A(1) and D, is section 209(e) and (e)(1)(D) of Pub. L. 93-236, Title II, Jan. 2, 1974, 87 Stat. 999, which enacted subsec. (e) and (e)(1)(D) of this section.
>
> Section 1152(a) and (a)(3) of NRSA, referred to in pars. A(1) and D, is section 1152(a) and (a)(3) of Pub. L. 97-35, Title XI, Aug. 13, 1981, 95 Stat. 676, which enacted section 1105(a) and (a)(3) of this title.
>
> Sections 303(c) and 306(c)(4) of the Act, referred to in par. A(2), are section 303(c) of Pub. L. 93-236, Title III, Jan. 2, 1974, 87 Stat. 1005, which enacted section 743(c) of this title and section 306(c)(4) of Pub. L. 93-236, Title III, as added Pub. L. 94-210, Title VI, § 610(b), Feb. 5, 1976, 90 Stat. 104, which enacted section 746(c)(4) of this title.

## Rule 11. Proceedings Under § 303(c) and Under § 306(c)(4) of the Act--Filings and Service

Except as the Court may otherwise direct by order, any pleading or paper filed with the Clerk in proceedings under §§ 303(c) and 306(c)(4) of the Act shall be served on all members of the Transferor Steering Committee and of the Government Parties Steering Committee, as those Steering Committees may be constituted from time to time. Two copies of each such pleading or other paper so filed and served shall be delivered to each of the three judges of the General Panel.

> **References in Text.** Sections 303(c) and 306(c)(4) of the Act, referred to in text, are section 303(c) of Pub. L. 93-236, Title III, Jan. 2, 1974, 87 Stat. 1005, which enacted section 743(c) of this title and section 306(c)(4) of Pub. L. 93-236, Title III, as added Pub. L. 94-210, Title VI, § 610(b), Feb. 5, 1976, 90 Stat. 104, which enacted section 746(c)(4) of this title.

## Rule 12. Applicability of Federal Rules of Civil Procedure

Except as herein otherwise provided, proceedings described in Rule 10 and Rule 11 shall conform to the Federal Rules of Civil Procedure insofar as these may be applicable and are not inconsistent with the Act, NRSA, or the rules of this Court, save as the Court for good cause may otherwise direct by order in a particular case or class of cases.

> **References in Text.** The Act, referred to in text, means the **Regional Rail Reorganization Act** of 1973, Pub.L. 93-236, Jan. 2, 1974, 87 Stat. 985, as amended, which is classified principally to this chapter (section 701 et seq.). For complete classification of this Act to the Code, see Short Title note set out under section 701 of this title and Tables volume.
>
> NRSA, referred to in text, is Subtitle E of Title XI (sections 1131-1169) of Pub.L. 97-35, Aug. 13, 1981, 95 Stat. 643, known as the Northeast Rail Service Act of 1981. For complete classification of this subtitle to the Code, see Short Title note set out under section 1101 of this title and Tables volume.

## Rule 13. Proceedings Involving Interstate Commerce Commission

In any proceeding involving a question that arises under the Interstate Commerce Act and related laws (codified in Subtitle 4 of Title 49 of the United States Code), or the rules, regulations, or orders of the Interstate Commerce Commission issued thereunder, or that affects a proceeding that is pending before or may properly be brought in the first instance before the Interstate Commerce Commission, a copy of each pleading or other paper

filed with the Clerk shall be served upon the General Counsel, Interstate Commerce Commission, Washington, D.C. 20423.

**References in Text.** Subtitle 4 of Title 49 of the United States Code, referred to in text, probably means Subtitle IV of Title 49, which is classified to section 10101 et seq. of Title 49, Transportation.

## Rule 14. Proceedings Under Section 305(d) of the Act

**A.   Commencement of proceedings.** Proceedings under § 305(d) of the Act shall begin by the filing of a petition by USRA or the Secretary.

**B.   Service of petition on Conrail and publication in the Federal Register.** The petition shall be served upon Conrail prior to its filing with the Special Court, and notice of the petition shall be published in the Federal Register within seven days after filing.

**C.   Answer of Conrail to petition.** Any answer by Conrail shall be served on the petitioner and filed with the Court within fourteen days after the filing of the petition.

**D.   Application for intervention.** Except for good cause shown, any application for leave to intervene shall be served on the petitioner and filed within fourteen days after publication of the petition in the Federal Register.

**E.   Filing of record.** The petitioner shall file the record made before USRA, the Secretary, and the Interstate Commerce Commission within fourteen days after the filing of the petition.

**F.   Additional evidence.** Any application for leave to adduce additional evidence shall be made within twenty-one days after the filing of the petition and, except for good cause shown, any such application by an intervenor shall be made within seven days after the grant of intervention or the filing of the record, whichever shall last occur. Such an application will be granted only if the applicant shows to the satisfaction of the Court that such additional evidence is material, that there were reasonable grounds for failure to adduce it in earlier proceedings, and that granting the application will not prevent the Court from deciding the petition within the time provided by the Act.

**References in Text.** The Act, referred to in pars. A and F, is Pub. L. 93-236, Jan. 2, 1974, 87 Stat. 985, as amended, known as the **Regional Rail Reorganization Act** of 1973, which is classified principally to this chapter (section 701 et seq.). Section 305(d) of the Act is classified to section 745(d) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 701 of this title and Tables volume.

## Rule 15. Motions

Except as provided in Rule 16 or as the Court may otherwise direct by order, all motions shall be made only by order to show cause submitted to the executive attorney of the Court, who will set the nature of further proceedings, including the date and place of any hearing, on instructions from one or more of the judges, or, in the event of his absence or unavailability, to one of the judges of the Court who will proceed in similar fashion.

## Rule 16. Entry of Orders by the Executive Attorney

**A. Entry of orders by executive attorney.** The executive attorney is authorized, in his discretion and subject to review by the Court, to take appropriate action and enter orders for the Court in procedural matters including the following:

> **(1)** Orders granting procedural motions, if such a procedural motion contains a written statement that all parties consent to the entry of an order granting the motion;

> **(2)** Orders granting motions to which no objections have been filed in response to an order to show cause issued pursuant to Rule 15;

> **(3)** Orders granting motions for voluntary dismissal of an action pursuant to Rule 41(a)(2), F.R.Civ.P.;

> **(4)** Pretrial orders entered pursuant to Rule 16, F.R.Civ.P.;

> **(5)** Orders scheduling proceedings before the Court.

**B. Reconsideration of orders entered by executive attorney.** Any party adversely affected by an order entered by the executive attorney pursuant to this subdivision or rule shall be entitled to reconsideration thereof by a judge of the Court if, within fourteen days of entry of such order, such party files a motion for reconsideration giving the grounds therefor.

## Rule 17. Opinions and Rulings of the Court

Opinions and rulings of the Special Court, unless delivered orally, shall be filed in the office of the Clerk who shall promptly reproduce them and distribute one copy to each party.

## Rule 18. Petitions for Reconsideration

**A. Time for filing; content; answer; action by Court if granted.** A petition for reconsideration may be filed within 20 days after entry of judgment unless the time is shortened or enlarged by order. The petition shall state with particularity the points of law or fact which in the opinion of the petitioner the Court has overlooked or misapprehended and shall contain such argument in support of the petition as the petitioner desires to present. Oral argument in support of the petition will not be permitted. No answer to a petition for reconsideration will be received unless requested by the Court, but a petition for reconsideration will ordinarily not be granted in the absence of such a request. If a petition for reconsideration is granted the Court may make a final disposition of the cause without reargument or may restore it to the calendar for reargument or resubmission or may make such other orders as are deemed appropriate under the circumstances of the particular case.

**B. Filing of petition; length.** Any petition for reconsideration shall be filed in the manner prescribed by Rule 9. Except with permission by the Court, a petition for reconsideration shall not exceed 20 pages.

## Rule 19. References to Regional Rail Reorganization Act and Northeast Rail Services Act

In all papers filed with the Court references of sections of the **Regional Rail Reorganization Act** of 1973 or Northeast Rail Service Act of 1981 shall be to such sections as numbered in the applicable Act and not to such sections as numbered in the U.S. Code.

**References in Text.** The **Regional Rail Reorganization Act** of 1973, referred to in text, is Pub.L. 93-236, Jan. 2, 1974, 87 Stat. 985, as amended, which is classified principally to this chapter (section 701 et seq.). For complete classification of this Act to the Code see Short Title note set out under section 701 of this title and Tables volume.

The Northeast Rail Service Act of 1981, referred to in text, is Subtitle E of Title XI (sections 1131-1169) of Pub.L. 97-35, Aug. 13, 1981, 95 Stat. 643. For complete classification of this Act to the Code, see Short Title note set out under section 1101 of this title and Tables volume.

IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CITY OF PHILADELPHIA

v.

CONSOLIDATED RAIL CORPORATION
and NATIONAL RAILROAD PASSENGER
CORPORATION

:::::::::::::::::::::::::::::::::

CONSOLIDATED RAIL CORPORATION

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION

Special Court
Regional Rail Act
C.A. NO. 96-RR-01[1]

Special Court
Regional Rail Act
C.A. NO. 96-RR-03

WEINER, J.[2]                                    November 3, 1997

## MEMORANDUM OPINION AND ORDER

In these consolidated cases the City of Philadelphia seeks a declaration that the Consolidated Rail Corporation (Conrail), and the National Railroad Passenger Corporation (Amtrak), as assignees or successors in interest of the Pennsylva-

---

[1] The Special Court, Regional Rail Reorganization Act of 1973 was abolished by Congress effective January 17, 1997, and its original jurisdiction transferred to the United States District Court for the District of Columbia.

[2] United States District Judge for the Eastern District of Pennsylvania, and Judge of the Special Court, Regional Rail Reorganization Act, sitting by designation.

nia Railroad Company (PRR) are responsible to maintain, repair and reconstruct a bridge in Philadelphia carrying 41st Street over a railroad right of way. Liability is premised on a contract executed between the City and PRR in 1927. In addition, Conrail seeks a declaration enjoining the Pennsylvania Public Utility Commission (PUC) from holding it liable for any costs related to rehabilitation of the bridge. Presently before the court in 96-1 are motions for summary judgment filed by the City and Conrail; in 96-3 are motions by the PUC to dismiss the complaint of Conrail and a motion by Conrail for summary judgment. For the reasons which follow, judgment will be entered in favor of the City in 96-1; judgment will be entered in favor of the PUC in 96-3.

The facts, which are not seriously disputed, are as follows. Under a contract executed in 1927, PRR agreed to construct a bridge to carry 41st Street over its right of way in West Philadelphia. PRR further agreed, on behalf of itself and its successors and assigns, to maintain the structure indefinitely at no cost to the City. As a result of the bankruptcy of the Penn Central Transportation Corporation (PCTC), PRR's successor, ownership of the railroad rights of way vested in defendants Conrail and Amtrak. The PUC has determined that the bridge is in need of substantial repair to prevent its collapse. Conrail and Amtrak have disavowed any liability to maintain the bridge, asserting that such liability did not pass to them under the Regional Rail Reorganization Act of 1973 (Rail Act), 45 U.S.C. § 701, et seq.

On March 30, 1976, pursuant to a conveyance order of this court, the trustees of PCTC transferred PCTC's real property in Philadelphia County to Conrail, along with all rights of way, appurtenances, improvements and fixtures. Simultaneously, the trustees also transferred certain "Administrative Assets" to Conrail pursuant to a Bill of Sale. These assets included PCTC's rights in every contract "which is used or useful in the provision of rail services," but expressly reserved and excepted from conveyance all agreements for "the maintenance and security of rail properties, real or personal, which are not conveyed to Grantee". Also excluded were contracts for "rehabilitation or modernization of rail properties which would require Grantee, to complete such rehabilitation or modernization subsequent to conveyance date, without complete financial remuneration". On April 1, 1976, Conrail transferred a portion of its real and railroad property to Amtrak, including part of the realty, right of way and appurtenances at 41st Street. The parties also executed a similar transfer of "Administrative Assets". Following these transactions, Conrail owned two sets of railroad tracks and their associated rights of way under the 41st Street Bridge. Amtrak owned the remaining four sets of tracks and rights of way. There is no reference by name in any document to the 41st Street Bridge or the 1927 contract.

On November 5, 1993, the City notified the PUC that due to deterioration, the City had reduced the posted allowable load on the bridge from twenty tons to three tons. The PUC approved the City's action and commenced an investigation to determine what

3

repairs would be necessary, to allocate the costs of repair and assign future maintenance responsibility. The PUC also directed Amtrak to complete a repair plan for the bridge to restore its piers and bearings to their original load bearing capacity. The City was ordered to pay the initial cost necessary to repair the bridge. Subsequently, the City closed the bridge to vehicular traffic.

On June 16, 1994, the PUC conducted an evidentiary hearing before an administrative law judge (ALJ). The City, Conrail, and the Southeastern Pennsylvania Transportation Authority (SEPTA) participated in the hearing. Amtrak failed to appear. Conrail disclaimed liability for repairing and maintaining the bridge, asserting that, if it indeed ever owned the bridge, it conveyed the bridge to Amtrak. It offered evidence that it operates no trains over the tracks under the bridge. It also offered evidence that it installed the trackage at the request of the City to service a proposed industrial park which was never constructed. SEPTA denied liability as well, asserting its only interest was a track lease agreement with Amtrak. On January 20, 1995, the ALJ issued a recommended decision finding that the PUC could not order Amtrak or Conrail to perform repairs under the 1927 contract, since the PUC does not have contract enforcement powers. The PUC adopted this recommendation and ordered the City to perform an inspection, prepare plans to repair the bridge, and conduct the repairs within one year of the PUC's approval of its plan. The PUC also ordered Conrail to reimburse the City for twenty percent of

4

the cost of repair and maintain the bridge upon completion of the City's repairs.  It declined to impose costs on Amtrak, concluding that such costs would constitute a tax in violation of 49 U.S.C. § 24301(1).[3]  Both the City and Conrail appealed the order to the Pennsylvania Commonwealth Court.  By order of May 24, 1996, that court remanded the case back to the PUC for reapportionment of the costs of repair between the City, Conrail and Amtrak, finding that allocating costs to Amtrak would not violate § 24301(1).  These actions followed shortly thereafter.

DISCUSSION

Who own's the Bridge?

The 1927 agreement.

        The ordinance-agreement provides that the City agreed to "permit" PRR to construct a bridge in the line of 41st Street over the right of way of PRR's Main Line.  It further provides that PRR "shall save the City of Philadelphia from all expense in the cost of construction, and the cost of future maintenance of said bridge. . ."  There is no more specific recital in the agreement concerning ownership of the bridge to be built.  The Certificate of Public

_____

[3]The statute, a recodification of 45 U.S.C. § 546b, provides: Amtrak or a rail carrier subsidiary of Amtrak is exempt from a tax or fee imposed by a State, a political subdivision of a State, or a local taxing authority and levied on it after September 30, 1981.

Convenience issued by the PUC, as well as the enabling ordinance enacted by the Philadelphia City Council, are likewise silent.

In its response to the City's motion for summary judgment, Amtrak argues that under the common law, as it existed at the time the bridge was constructed, all public highways were deemed owned by the City or State. See, e.g. Tranter v. Allegheny County Authority., 316 Pa. 65, 74, 173 A. 289, 293 (1934) (highways, roads, streets and bridges of the Commonwealth, apart from private ownership turnpikes, are property of the State). See also Heinlein v. Allegheny County, 374 Pa. 496, 98 A.2d 36 (1953) (The rule at common law that a bridge is a part of the highway traversing it was long ago declared to be the law of this State.). Amtrak concludes that, since no exception to this general rule was provided in the ordinance or agreement, it follows that the bridge was never the property of PRR, and thus was never transferred by the Trustees to either Conrail or Amtrak.

The City responds by pointing to numerous cases, both federal and state, where courts have recognized that often the chain of title to overhead bridges ends with utilities, and not the state. See e.g. Southeastern Pennsylvania Transportation Auth. v. Pennsylvania Public Utility Commission, 802 F.Supp. 1273, 1277 (E.D.Pa. 1992) (SEPTA II) (noting that SEPTA owned three of the four overhead bridges at issue); Consolidated Rail Corporation v. Pennsylvania Public Utility Commission, 55 Pa. Cmwlth. 576, 423 A.2d 1108 (Pa.Cmwlth. 1980). These decisions, confined to the facts at issue, cannot, be read to establish a general rule of

6

bridge ownership.  Rather, we must examine the facts presented in this case to determine who "owns" the bridge.

It is undisputed that PRR owned the realty upon which the bridge was constructed.  It is also undisputed that PRR bore the full cost of constructing the bridge, which it built for its own railroad purposes, i.e. to maintain the grade of its tracks below that of 41st Street and avoid the delays inherent in an at grade crossing.  It also agreed to hold the City harmless in toto for the cost of construction as well as future maintenance.  The bridge, when constructed, became an appurtenance or fixture to the real property.  Since it is undisputed that PRR owned the realty, both before and after the bridge was constructed, the City's interest, both before and after construction, must necessarily be limited to an easement for its street.  Construction of the bridge merely altered the manner in which the City's easement was enjoyed.  Since it is not disputed that PRR owned the realty, and no party has pointed to a chain of title offering a different result, we conclude that the bridge was owned by PRR.

The March 31 transfer.

Even though we find that PRR owned the bridge, Conrail argues it has no liability to maintain it under the terms of the March 31 transfer from the Trustees.  It asserts that the 1927 contract, being one for the construction, demolition, rehabilitation or modernization, was specifically excluded from the Trustees' conveyance.  Schedule E to the Bill of Sale conveyed to Conrail all

7

contract rights owned by the Trustees "which is used or useful in the provision of rail services". However, the Bill of Sale expressly reserves certain contract rights to the Trustees, including

> 3.    All agreements for rehabilitation or modernization of rail properties which would require Grantee, to complete such rehabilitation or modernization subsequent to conveyance date, without complete financial remuneration.
>
> . . .
>
> 9.    All agreements for the maintenance and security of rail properties, real or personal, which are not conveyed to Grantee.

While Conrail premises its argument on both paragraphs, given our holding that the bridge was conveyed to Conrail, its reliance on ¶ 9 is without substance.[4]

As regards ¶ 3, the question we must determine is whether the 1927 Agreement was one for "rehabilitation or modernization". We find it is not. The contract was for permission to build a bridge, which changed the manner in which the City enjoyed its easement. The consideration given by PRR was its promise to pay for the construction, and maintain the bridge in perpetuity at no cost to the City. Paragraph 3 does not by its terms exclude

---

[4]Conrail and Amtrak also make the preliminary argument that the bridge is not "used or useful" to the provision of rail services. We fail to see the basis for such an argument. While the bridge is an automobile bridge and not a railroad trestle, it permits trains to travel at a consistent grade below that of 41st Street. If there was no bridge, the tracks could not have been built below grade. It is thus clearly "useful" for the provision of rail services. We also disagree with Amtrak's assertion that the bridge structure, because it is part of a highway, is an easement and not a fixture or appurtenance to the real property. An easement is merely a right of use over the property of another. Black's Law Dictionary, Sixth Ed., p. 509. It refers to the right, not the physical structure by which that right is enjoyed.

contracts for "maintenance" of rail properties transferred to Conrail, only their rehabilitation and modernization. By contrast, ¶ 9 specifically states that agreements for maintenance of rail properties not transferred to Conrail are excluded. We seriously doubt that the drafters of the Bill of Sale would have used the words they did in ¶ 3 if they intended to exclude maintenance, given that they did use the word "maintenance" in a situation where their intent to exclude contracts for maintenance was obvious.[5] Thus, we conclude that the Trustees conveyed to Conrail, and by subsequent reconveyance to Amtrak, both ownership of the bridge and the contractual obligation to maintain it.[6]

---

[5]While we note that contractual liability for the "rehabilitation or modernization of rail properties which would require Grantee, to complete such rehabilitation or modernization subsequent to conveyance date, without complete financial remuneration" was specifically excluded from the conveyance to Conrail and Amtrak, we do not find this language applies to the 1927 agreement. The contract, if properly performed, required only that the bridge be maintained. The present need for more significant repairs was caused by nonfeasance of those contractual obligations.

[6]Our conclusion is consistent with the view espoused in the Final Report of the United States Railway Association:

> In the opinion of the USRA staff, the language in the real estate conveyance instruments prepared by USRA is clear. To the extent that a transferor railroad had an interest in any such bridge, it was conveyed. . . . [I]n the view of the USRA staff, the conveyance did not alter any pre-existing obligation of the transferor railroad to maintain these bridges; and if the rail line was conveyed to Conrail (or to another transferee), then any associated maintenance obligation was also transferred.

The Conveyance Process, A Supplement to the Final Report of the United States Railway Association (December 1986) at 29-31.

The "Fresh Start Policy".

In the alternative, Conrail and Amtrak also argue that the "fresh start" policy, embodied in the statute that created them, as well as the conveyance orders issued by this court, precludes any liability for pre-April 1, 1976 deterioration to the bridge. This argument has some legal merit, but is factually unsupported by the record presented.

Section 303(b)(2) of the Rail Act, 45 U.S.C. § 743(b)(2), provides that the conveyances shall be made "free and clear of any liens and encumbrances, but subject to such leases and agreements as shall have previously burdened such properties". The conveyances were drawn with the intent to give the successor railroads a clean slate as of the date that they took possession of the rail properties from the trustees. See generally, Penn Central Corp. v. United States, 862 F.Supp. 437, 462-64 (Sp.Ct. R.R.R. 1994). Under the conveyance orders, Conrail and Amtrak assumed "only that portion of the obligation or liability which is reasonably allocable to the part or the period after [April 1, 1976]." Id. at 464.

The fresh start policy embodied in the Rail Act, and incorporated into the conveyancing documents, creates a bright line date upon which the liability of PCTC ended and the liability of Conrail and Amtrak began. Congress mandated that there be no successor liability hindering the future financial well being of the newly created railroads. Any recovery in contract, tort or otherwise for the conduct of PCTC was legislatively and contractu-

10

ally apportioned to be satisfied out of the assets of the bankrupt railroad.

Thus, to the extent that this action seeks to hold Conrail or Amtrak liable as PCTC's successor in interest for PCTC's conduct, that liability has been legally extinguished. The City's complaint, however, is not susceptible to such a limited reading. Rather, it seeks a declaration that Conrail and Amtrak are liable for future maintenance, as well as the cost of repairs that have been ordered by the PUC. Thus, we must address two questions of allocation. The first question is to what extent should the cost of repair be allocated to pre-April 1, 1976 deterioration. The second question is the allocation of post-April 1, 1976 liability between Conrail, Amtrak and any other party.

Allocation of liability as to time.

In its papers, Conrail argues that it is not liable to remedy pre-conveyance deterioration, but no makes argument regarding how to make such an allocation. As part of its arguments in 96-3, the PUC argues it is impossible to make such an allocation because it is an engineering impossibility to determine at this point in time what deterioration occurred prior to April 1, 1976. The City avers in its response to the defendants' motions that all the costs of repairing the bridge arise out of post-conveyance failures to conduct necessary maintenance in a timely manner. The City avers it seeks no compensation for any pre-conveyance failures on the part of PRR, PCTC, or the trustees to maintain the bridge.

To resolve the factual question, the City has appended to its response an inspection report of the bridge conducted by the trustees in October 1975, just six months prior to the conveyances. The report notes only minor defects in the bridge. No party has presented any evidence to contradict this report. Even construing the record in the light most favorable to Amtrak and Conrail, we must conclude that any present deterioration in the bridge occurred substantially within the post-conveyance period.

Allocation of liability between Conrail and Amtrak.

Regarding the allocation among Conrail and Amtrak, we must first look to the April 1 conveyance by which Conrail conveyed to Amtrak part of its interest in the rail lines which lie under 41st Street. Of the six rail lines, Conrail reconveyed four to Amtrak. It thus asserts that any liability should be apportioned between itself and Amtrak one-third to two-thirds. While not contesting the equity of Conrail's apportionment, Amtrak argues here, as it did before the PUC and Commonwealth Court, that any assessment against it would constitute an illegal local tax pursuant to 49 U.S.C. § 24301(1). We do not agree.

Is the PUC's allocation of costs against Amtrak a "tax"?

The Court of Appeals for the D.C. Circuit has apparently not had occasion to interpret the language of § 24301 or its predecessor statute. The Court of Appeals for the Third Circuit in National Railroad Passenger Corp. v. Pennsylvania Public Utility

Commission, 848 F.2d 436 (3d Cir. 1988) (hereinafter "PUC"), reasoned that an order of the PUC directing Amtrak to contribute to the cost of construction of grade crossing improvements constituted a state tax violative of § 24301. Finding that such a charge would be similar to a "special assessment", the court concluded that Amtrak would be exempt from liability to the same extent as the United States would be exempt. Id. at 440, citing H.R.Pep. No. 81, 97th Cong. 1st Sess. 21 (1981) (. . . "Amtrak was to be exempt from payment of 'all state and local taxes, **including but not limited to** property taxes, income and franchise taxes, sales taxes, gross revenue taxes, fuel taxes, licenses and other fees, **to the same extent as the United States is exempt** from the payment of such taxes or other fees'".) (emphasis supplied).

The Court of Appeals for the Second Circuit has held, however, that the section should be more narrowly construed. In National Railroad Passenger Corp. v. City of New York, 882 F.2d 710 (2d Cir. 1989), the court determined that Amtrak was liable for moneys due to the City of New York under two contracts entered into by Amtrak's predecessors. The contracts granted a "franchise" to build and maintain tunnels under City streets.

The Second Circuit found that the reason Congress chose to use the words "imposed" and "levied" in the predecessor statute was that it believed that the bill it was considering applied to taxes and other fees that could be construed as taxes -- i.e., fees unilaterally imposed by a sovereign on its citizens. Id. at 714. The court went on to state that there was no evidence in the

legislative history that Congress' intended to exempt Amtrak from all payments to state and local governments. Id. Examining the nature of the payments at issue, the court found the "franchise" fees were in the nature of rental payments for the use of public property, and concluded that Congress never intended to permit Amtrak to have the right to use property without payment for the right to that use.

We find Amtrak's liability for maintenance at issue here is more akin to the type of liability found to be outside the scope of § 24301 in City of New York. As in that case, the maintenance liability here was created by a contract entered into at arms length by the parties. PRR's acceptance of the duty to maintain the bridge was not unilaterally imposed by a sovereign.

Characterizing the liability to maintain the bridge as a special assessment on property also strikes us as inapt. A special assessment is a levy intended to offset the capital cost of local improvements that benefit the subject property. It differs from a general tax in that it is levied for a specific purpose and in an amount proportioned to the direct benefit of the property assessed. See generally, Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission, 592 A.2d 797 (Pa.Cmwlth. 1991). Maintenance, if timely performed is, however, an operational cost, not a capital cost. It adds no value to the subject property beyond the fact that it guards against future loss in value due to deterioration. In addition, the "special assessment" analogy in PUC was used to describe a situation where a bridge was

ordered to be replaced, not merely repaired.

On a more fundamental ground we also cannot agree with the Third Circuit's conclusion that a PUC order imposing and allocating liability for grade crossing improvements constitutes a "tax" of any kind. The PUC is a quasi-judicial, as well as quasi legislative agency, charged with determining the need for grade crossings and maintaining their safety. Pa. Con. Stat. Ann. tit. 66, § 2702. Its power to allocate the cost of correcting unsafe conditions, we find, is quasi-judicial, and not quasi-legislative in nature, since its cost allocation must be just, reasonable and based on substantial evidence. Borough of South Greensburg v. Pennsylvania Public Utility Commission, 117 Pa.Cmwlth 361, 544 A.2d 82 (Pa. Cmwlth. 1988). Conversely, the levying of a tax is a purely legislative function where such considerations are not binding. In short, we see no more reason to consider a quasi-judicial administrative order of the PUC allocating the cost of grade crossing maintenance a "tax", than any other judgment which would mandate Amtrak to expend funds. Just because a state agency mandates that Amtrak spend money does not mean that its order is a "tax".

We also find strong public policy considerations present here which militate against construing the PUC's allocation as a tax, thus permitting Amtrak to avoid liability. The current need for "rehabilitation" of the bridge arises, not because the bridge was innately inadequate for its intended purpose, or has become outdated for present purposes, but because the bridge was permitted

to become unsafe through twenty years of deferred or neglected maintenance. It strikes the court as inherently inequitable to permit the party which caused the bridge's deterioration through neglect to now shift the responsibility to correct those actions to the public weal by arguing that any remedy imposed to correct the nonfeasance would constitute a tax. It would be unconscionable to permit a party, purposefully or not, to create a dangerous and unsafe bridge in hopes converting a private "maintenance" responsibility into a public liability to correct the safety defect. Had Amtrak and Conrail not deferred their maintenance responsibilities, the load bearing capacity of the bridge would not have been compromised. In short, it would be too dangerous a precedent to permit an intentional policy of deferred maintenance, to the point where safety is compromised, to shift the financial responsibility for correcting the unsafe condition. Rather, equity demands that the duty should remain with Amtrak and Conrail. Accordingly, we find that the financial liability for the rehabilitation should be allocated between Conrail and Amtrak in proportion to the number of tracks each operates at the 41st Street crossing.[7]

The PUC's Motion to dismiss.

We next take up the motion of the PUC to dismiss the

---

[7]In reaching this determination, we recognize that a split in authorities continues unabated. But for the special jurisdiction of this court, the dispute involving the allocation of liability would probably have found its way to the Third Circuit, rather than this court, now sitting under the jurisdiction of the D.C. Circuit. This court's long experience with railroad reorganization disputes and the public policy issues we have addressed, however, convince us that where liability is premised upon the conveyancing documents approved by this court, our own precedents should be followed.

complaint of Conrail in 96-3.[8]  The motion raises the Eleventh Amendment as a bar to our jurisdiction.  Although the parties have extensively briefed the issue, we need not discuss it at any length.  Rather, we adopt the reasoning expressed by Judge Newcomer in his recent decision in <u>National Railroad Passenger Corporation</u> <u>v. Commonwealth of Pennsylvania Public Utility Commission, et al.</u>, C.A. 86-5357 (E.D.Pa. September 15, 1997).  In that action, Judge Newcomer addressed the same arguments raised by the PUC here, determining after a lengthy and thorough analysis that PUC was not an alter ego of the Commonwealth of Pennsylvania.  Slip op. at 11-25.

Having determined that our jurisdiction is not barred by the Eleventh Amendment, we reach the merits of the claims.  The complaint seeks to enjoin the PUC from entering an order declaring Conrail liable for any obligations under the May 11, 1927 agreement.  It also seeks an order declaring that, in the event we find that the contract was conveyed to Conrail that we enter an order declaring that all liabilities thereunder were conveyed to Amtrak.  Having addressed both these issues above, finding against Conrail on the merits, we need not enter into any further discussion except to note that, to the extent that Conrail seeks to enjoin the PUC from adjudicating contract rights, the PUC has specifically declined to do so in its consideration of the matter, and given our

---

[8]This is the only dispositive motion filed by the PUC.  It has, however also filed a "Brief on the Merits", to which Conrail and the City have responded.  We shall construe the brief as a motion for summary judgment.

decision, the other arguments Conrail makes are now moot.  Accordingly, judgment in 96-3 will be entered in favor of the PUC and against Conrail.

IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CITY OF PHILADELPHIA                        :
                                            :
                                            :
                                            :
                  v.                        :        Special Court
                                            :        Regional Rail Act
                                            :        C.A. NO. 96-RR-01[9]
                                            :
                                            :
CONSOLIDATED RAIL CORPORATION               :
and NATIONAL RAILROAD PASSENGER             :
CORPORATION                                 :
: : : : : : : : : : : : : : : : : : : : : : : : : :
CONSOLIDATED RAIL CORPORATION               :
                                            :
                                            :
                  v.                        :        Special Court
                                            :        Regional Rail Act
                                            :        C.A. NO. 96-RR-03
                                            :
PENNSYLVANIA PUBLIC UTILITY              -  :
COMMISSION                                  :
                                            :

## ORDER

The motion of the City of Philadelphia in C.A. NO. 96-RR-
01 for summary judgment is GRANTED.

The motion of Consolidated Rail Corporation for summary
judgment in C.A. NO. 96-RR-01 for summary judgment is DENIED.

Judgment on the merits in C.A. NO. 96-RR-01 is ENTERED in
favor of the City of Philadelphia and against Consolidated Rail
Corporation and National Railroad Passenger Corporation.

---

[9]The Special Court, Regional Rail Reorganization Act of 1973
was abolished by Congress effective January 17, 1997, and its
original jurisdiction transferred to the United States District
Court for the District of Columbia.

The Court DECLARES that:

(a). Consolidated Rail Corporation and National Railroad Passenger Corporation, as assignees and successors of the Pennsylvania Railroad Company, are liable for the continued maintenance of the 41st Street Bridge, as set forth in the May 11, 1927 agreement between the Pennsylvania Railroad Company and the City of Philadelphia; said liability to be apportioned between them one-third to Consolidated Rail Corporation and two-thirds to National Railroad Passenger Corporation;

(b). Consolidated Rail Corporation and National Railroad Passenger Corporation are DIRECTED to perform all work necessary to repair the 41st Street Bridge, as mandated by the Pennsylvania Public Utility Commission; said liability to be apportioned between them one-third to Consolidated Rail Corporation and two-thirds to National Railroad Passenger Corporation;

(c). In the alternative to ¶ (b), Consolidated Rail Corporation and National Railroad Passenger Corporation are DIRECTED to reimburse the City of Philadelphia for its performance of work necessary to repair the 41st Street Bridge, as mandated by the Pennsylvania Public Utility Commission; said liability to be apportioned between them one-third to Consolidated Rail Corporation and two-thirds to National Railroad Passenger Corporation;

(d). Consolidated Rail Corporation and National Railroad Passenger Corporation are DIRECTED to maintain the 41st Street Bridge indefinitely, at no cost to the City of Philadelphia; said liability to be apportioned between them one-third to Consolidated

Rail Corporation and two-thirds to National Railroad Passenger Corporation.

The motion of the Pennsylvania Public Utility Commission to dismiss the complaint of Consolidated Rail Corporation in C.A. NO. 96-RR-03 is DENIED.

The motion of Consolidated Rail Corporation for summary judgment in C.A. NO. 96-RR-03 is DENIED.

The "Brief on the Merits" of the Pennsylvania Public Utility Commission, construed by the court as a motion for summary judgment in C.A. NO. 96-RR-03 is GRANTED.

Judgment on the merits in C.A. NO. 96-RR-03 is ENTERED in favor of the Pennsylvania Public Utility Commission and against Consolidated Rail Corporation.

IT IS SO ORDERED.

CHARLES R. WEINER

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CONSOLIDATED RAIL CORPORATION, : | Civil Action No.: | 07-1370 (RMU) |

CONSOLIDATED RAIL
CORPORATION,                                    :        Civil Action No.:        07-1370 (RMU)
                                                             :
                                                             :
                        Plaintiffs,            :
                                                             :
            v.                                        :
                                                             :
GERARD A. RITTER and               :
SUSAN R. NOREK *ex rel.* GERARD H.   :
RITTER, deceased.                         :
                                                             :
                        Defendants.         :
CONSOLIDATED RAIL                  :        Civil Action No.:        07-1371 (RMU)
CORPORATION,                            :
                                                             :
                        Plaintiff,               :
            v.                                        :
                                                             :
JOHN M. GRIBBIN,                       :
                                                             :
                        Defendant.           :

**ORDER**

     This _____ day of _____, 2008, upon consideration of Consolidated Rail

Corporation's ("Conrail") Motion for Reconsideration, and any opposition, it is

     ORDERED, that Conrail's Motion is GRANTED, and it is FURTHER ORDERED that

the Court's previous Order granting Defendants' motions to dismiss is vacated; and it is

FURTHER ORDERED that the Court shall hold a scheduling conference in this action on

_____, 2008.

 

_____
Hon. Ricardo M. Urbina
United States District Judge